```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF PUERTO RICO
```

**United States of America**

    **v.**                                   Criminal No. 3:08-cr-297-PJB
                                         Opinion No. 2009 DNH 002
**Anibal Acevedo Vila, et al.**


                         MEMORANDUM AND ORDER

    Defendants Anibal Acevedo Vila, Luisa Inclan Bird, and Miguel Nazario Franco have been charged with four counts of honest services wire fraud and one count of conspiracy to commit money laundering.  Defendants have filed a motion to dismiss the Indictment in its entirety.

                            **I.   BACKGROUND**

    In 2004, then-Resident Commissioner Acevedo Vila embarked on a campaign for Governor of the Commonwealth of Puerto Rico, forming the Comité Anibal 2004, Inc. ("Comité Anibal") to help accomplish this end.  (Indictment, Doc. No. 1, at 1.)  Inclan Bird worked in the finance department of the Comité Anibal, where "[s]he was closely connected with fund-raising efforts on behalf of the Comité Anibal, and handled sizable cash contributions."  (Id. at 2.)  She also served as an advisor to Acevedo Vila, both before and after he was elected governor.  Nazario Franco was the

director of the finance department of the Comité Anibal.  (Id.)

The criminal scheme alleged in the Indictment concerns the manner in which the Comité Anibal's debts were retired and the role that each defendant played in that endeavor.  The allegations related to each of the counts in the Indictment are set forth below.

**A.    COUNTS 1-4: HONEST SERVICES WIRE FRAUD**

Counts 1 through 4 charge that between January 2003 and October 2006, defendants "devised and intended to devise, a scheme and artifice to defraud and deprive the Commonwealth of Puerto Rico and its citizens of their intangible right to honest and faithful services," in violation of 18 U.S.C. §§ 1343, 1346, and 2.  (Id. at 3.)  The Indictment goes on to allege that in furtherance of this scheme, defendants "did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals. . . ."  (Id.)  At the heart of these charges is the allegation that defendants surreptitiously obtained approximately $250,000 in illegal campaign contributions from a Puerto Rican business leader, and then used the power of the governor's office to benefit the business leader.  (Id. at 2, 4.)

The scheme allegedly began at some point during 2004 and 2005, when the business leader ("Collaborator 18") concealed $200,000 in payments to the Comite Anibal by "fraudulently disguising them as *bona fide* payments for services to Company E supported by fraudulent invoices." (Id. at 4.) More specifically, the Indictment alleges that Collaborator 18 issued separate checks from his various companies to Company E, and Company E then used those funds to cancel the debts owed to it by the Comité Anibal and Acevedo Vila for its advertising services. (Id.) The Indictment further charges that after winning the election, Acevedo Vila met with Collaborator 18 to discuss his business interests and instructed Inclan Bird and others "to provide official assistance to Collaborator 18 in his dealings with the government of Puerto Rico." (Id. at 5.)

At the invitation of Inclan Bird, Collaborator 18 attended a gathering in February 2006, with Acevedo Vila and Nazario Franco present, at which "campaign supporters solicited an additional $50,000 in funds from Collaborator 18. . . ." (Id.) These funds, allegedly paid in installments until October 2006, were paid to Company E in the same manner as the earlier scheme. Before those payments were completed, Acevedo Vila and Inclan Bird allegedly "continued to provide official assistance to

Collaborator 18 in his business dealings" with Puerto Rico. (Id.)  At no point were any of Collaborator 18's payments made public.[1]

     Finally, the Indictment charges that in executing this scheme to "defraud and deprive the Commonwealth of Puerto Rico and its citizens of their intangible right to the honest faithful services," defendants "transmitted and caused to be transmitted by means of wire communications in interstate commerce, certain writings and signals."  Four emails, three of which were sent to Nazario Franco and one of which was sent to Inclan Bird, serve as the basis for Counts 1 through 4.

**B.**    <u>**COUNT 5: CONSPIRACY TO COMMIT MONEY LAUNDERING**</u>

     Count 5 alleges that defendants sought to "knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is, wire fraud. . . ."  (Id. at 7.)  The Indictment goes on to allege that Company E used the money delivered to it by Collaborator 18 to either "cancel[] debt

---

[1] Puerto Rico's election law restricts the amount of money an individual can contribute to a political campaign to $1,000 per year.  P.R. Laws Ann. tit. 16, § 3105(a).  Additionally, the law requires contributions of this kind to be reported under oath.  §§ 3105(b), 3111(a).

owed to Company E by defendant Acevedo Vila . . . or used part of those payments to pay other campaign vendors for services provided to defendant Acevedo Vila and Comité Anibal." (Id. at 8.)  Tracking the language of the money laundering statute, the Indictment charges that the defendants knew that the transactions were designed "to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and ... knew that the property involved in the financial transactions ... represented the proceeds of some form of unlawful activity." (Id. at 7.)  The government also claims that these payments from Collaborator 18 "were never disclosed in the various reports which legally required disclosure of all payments for the benefit" of Acevedo Vila and the Comité Anibal. (Id. at 9.)

## II.   STANDARD OF REVIEW

When considering a motion to dismiss an indictment, the court "treats the allegations as true and construes all facts in a light most favorable to the government." United States v. Burger, 773 F. Supp. 1430, 1433 (D. Kan. 1991). "A court should exercise its authority to dismiss cautiously, since to dismiss an indictment 'directly encroaches upon the fundamental role of the

grand jury.'"  United States v. Thomas, 519 F. Supp. 2d 141, 143-44 (D. Me. 2007) (quoting Whitehouse v. U. S. Dist. Court, 53 F.3d 1349, 1360 (1st Cir. 1995)).  The requirements of an indictment are simple and few:  it must set forth the elements of the offense charged, alert the defendant to what he is facing, and show "the defendant to what extent he may plead double jeopardy."  Burger, 773 F.Supp. at 1436.  If those requirements are met, then "an indictment, valid on its face, returned by a legally constituted grand jury, calls for a trial on the merits."  United States v. Rodriguez, 738 F.2d 13, 16 (1st Cir. 1984).

### III.   ANALYSIS

#### A.   HONEST SERVICES WIRE FRAUD

Defendants are charged with honest services wire fraud in violation of 18 U.S.C. § 1343, which criminalizes the use of interstate wires in executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  In the years leading up to 1987, the U.S. Court of Appeals for the First Circuit, as well as other circuits, had interpreted the "fraud" at issue in a wire fraud prosecution to include both schemes to deprive others of tangible property interests, such as money and

property, and schemes to deprive the public of the intangible right "to have public officials perform their duties honestly." United States v. Weyhrauch, 2008 WL 5003366, at *5 (9th Cir. 2008); see United States v. Sawyer, 239 F.3d 31, 39 (1st Cir. 2001); United States v. Lopez-Lukis, 102 F.3d 1164, 1168-69 (11th Cir. 1997).  In 1987, however, the U.S. Supreme Court held in McNally v. United States that the federal mail and wire fraud statutes were "limited in scope to the protection of property rights."  483 U.S. 350, 360 (1987).

In response, Congress enacted 18 U.S.C. § 1346, which "was intended to overrule McNally" and made clear that the "scheme or artifice to defraud" at issue in § 1343 includes a scheme to deprive another of the intangible right to honest services. Sawyer, 239 F.3d at 39.  In acting as it did, Congress effectively revived the line of cases that led up to McNally, and courts across the country, including the First Circuit, have since turned to those cases for guidance in interpreting § 1343. See, e.g., United States v. Williams, 441 F.3d 716, 722 (9th Cir. 2006) ("by overruling McNally, Congress restored the pre-McNally landscape"); United States v. Panarella, 277 F.3d 678, 690 (3d Cir. 2002) (courts should look to "pre-McNally cases interpreting § 1341 and § 1343"); United States v. Blumeyer, 114 F.3d 758, 765

(8th Cir. 1997) (the passage of § 1346 "restored the 'vitality' of our pre-McNally cases involving official corruption"); United States v. Sawyer, 85 F.3d 713, 723-24 (1st Cir. 1996) ("We have recognized that § 1346 was intended to overturn McNally and reinstate the reasoning of pre-McNally case law. . . .").

As it stands today, there are two types of honest services wire fraud. The first generally involves something akin to bribery. See, e.g., Sawyer, 85 F.3d at 730. The second, which is the type that concerns us here, requires a scheme to undertake services under the taint of an undisclosed conflict of interest. See, e.g., United States v. Woodward, 149 F.3d 46, 62-63 (1st Cir. 1998).

### 1. **Scheme to Benefit a Third Party**

Defendants first argue that the wire fraud charges are defective because they do not allege that Acevedo Vila personally benefitted from the alleged official actions that serve as the basis for the charges. This argument is easily disposed of because it is inconsistent with First Circuit precedent. In United States v. Silvano, the First Circuit affirmed an honest services wire fraud conviction based on a concealed conflict of interest. 812 F.2d 754, 758-62 (1st Cir. 1987). In doing so, the court flatly rejected the same argument that defendants

presented here by concluding that it "is immaterial whether [a public official] personally profited from the scheme or whether the City [he serves] suffered a financial loss from it.  Id. More recently, in United States v. Woodward, the court upheld an honest services wire fraud conviction based on a concealed conflict of interest in a case in which the public official did not directly benefit from the official actions he undertook as a part of the fraud scheme.  149 F.3d 46, 65 (1st Cir. 1998). Defendants have not offered persuasive arguments to distinguish these controlling precedents.  That ends the matter.

### 2.  **Conflict of Interest Based on Illegal Campaign Contributions**

Defendants next argue that the wire fraud charges are deficient because the concealed conflict on which they are based arises from illegal campaign contributions rather than a more direct personal benefit such as a gratuity.  Defendants do not point to any language in § 1346 that supports their argument. Nor do they cite any case in which an honest services wire fraud charge has been dismissed because the conflict of interest on which the charge is based arises from illegally concealed campaign contributions.  Instead, defendants base their argument on the contention that the benefit a candidate obtains from an

undisclosed campaign contribution is simply too speculative to support a wire fraud charge based on a concealed conflict theory. As defendants see it, this type of wire fraud should be limited to cases in which the concealed conflict arises from a direct benefit such as a gratuity.

I am unconvinced by this distinction because it minimizes the import of a campaign donation and the impact such a contribution could have on one's political fortunes. It hardly seems plausible to suggest that the viability of a wire fraud prosecution should turn on a distinction as meaningless as whether a candidate personally receives a gift of two thousand dollars or whether that gift is instead made out to the candidate's political committee. Either way, the candidate reaps "personal gain," see Woodward, 149 F.3d at 54.[2]

---

[2] Defendants also contend that innocent campaign contributors will end up as the targets of wire fraud prosecutions if undisclosed campaign contributions can serve as the basis for criminal charges. This contention overlooks the fact that wire fraud requires proof of criminal intent. Without both an intention to deprive the public of honest services and an intention to deceive, there can be no successful prosecution for honest services wire fraud. Sawyer, 85 F.3d at 729 n.12. Thus, there is little reason to fear that innocent campaign contributors will be exposed to prosecution for wire fraud simply because campaign officials fail to properly report their contributions.

### 3. Official Action Requirement

Defendants next argue that the wire fraud charges fail because they do not properly allege that defendants participated in a scheme to take official action on behalf of Collaborator 18. I reject this argument.

The Indictment charges that Acevedo Vila "provided direct and personal assistance to Collaborator 18's business interests by meeting directly with Collaborator 18 to discuss Collaborator 18's business concerns and proposals. . . ." (Indictment, Doc. No. 1, at 4-5.)  Acevedo Vila allegedly then directed "Inclan Bird as well as other aides and subordinates to provide official assistance to Collaborator 18 in his dealings with the government of Puerto Rico." (Id. at 5.) The Indictment alleges that when "directing such assistance, [Acevedo Vila would] inform some such aides that Collaborator 18 had helped his campaign." (Id.)

Defendants argue that these allegations are insufficient because neither meeting with a supporter nor instructing subordinates to take unspecified action on the contributor's behalf qualifies as official action. Defendants cite three major cases, two of which are from the First Circuit, that they claim support their argument that the Indictment does not sufficiently allege a scheme to take official action. Defendants first cite

-11-

United States v. Czubinski, where the First Circuit held that an Internal Revenue Service ("IRS") worker's review of confidential tax files could not serve as the basis for an honest services wire fraud prosecution.  106 F.3d 1069, 1077 (1st Cir. 1997).  Defendants in the present case, however, face a much different set of allegations.  Acevedo Vila is charged with using the weight of his office to "provide official assistance" to a generous donor who had secretly "helped his campaign." (Indictment, Doc. No. 1, at 5.)  Unlike Czubinski, where the defendant-employee was charged with "a relatively straightforward task that simply does not raise the specter of secretive, self-interested action," the Governor of Puerto Rico plays a "discretionary, decision-making role."  See 106 F.3d at 1077.  The set of allegations at issue here charge a chief executive with abusing the powers of his office by helping a man who furthered the Governor's political ambitions through illegal, secret donations; it is difficult to see how that claim compares to a "Contact Representative in the Boston office of the Taxpayer Services Division" of the IRS who impermissibly reviewed confidential documents.  Id. at 1071.

Defendants next rely on United States v. Urciuoli, wherein the First Circuit examined a state senator's "acceptance of

undisclosed payments for two sets of activities." 513 F.3d 290, 294 (1st Cir. 2008). The first involved his contact with mayors and other municipal officials to encourage them to comply with state law regarding ambulance patients and hospital choice. The second involved his use of power as a legislator to bully insurance companies into reaching favorable agreements with a company for which he worked. The First Circuit determined that the first type of conduct could not "qualify as a deprivation of the 'honest services' owed to the public." Id. at 295. Defendants now assert that the same kind of "informal advocacy with other officials on behalf of a constituent" is at issue here. (Defs.' Mot. to Dismiss, Doc. No. 19, at 13.) I disagree. Where the defendant in Urciuoli was a state senator with no authority over the municipal officials he was lobbying, defendant Acevedo Vila, as the chief executive of Puerto Rico, held significant authority over those who served in his administration. As Governor, Acevedo Vila's role was to "supervise the official conduct of all executive and ministerial officers," and there can be little doubt as to the amount of pressure a government agent would feel when the Governor or one of his senior aides instructs that agent to assist a generous campaign donor. See 3 P.R. Laws Ann. tit. 3, § 1. The

implication of that instruction need not be spelled out to anyone with a grasp of the reality of politics, and here, Acevedo Vila is charged with exploiting the dynamic of that relationship to benefit Collaborator 18.  Thus, I am persuaded that the conduct alleged here is actually more akin to the second type of conduct at issue in Urciuoli, which the First Circuit found to violate the honest services statute.  In Urciuoli, the insurance groups that the senator pressured frequently had important business before the legislative committee he chaired.  He "exploit[ed] this connection" in his contacts with the private insurers by threatening them with "a barely veiled warning of potential legislative trouble" if they did not acquiesce to his wishes.  Urciuoli, 513 F.3d at 296.  The government employees who allegedly received calls from Acevedo Vila's office would likely have felt similar pressure to take the necessary action to further Collaborator 18's interests.

    Finally, defendants cite United States v. Rabbitt, wherein the U.S. Court of Appeals for the Eighth Circuit held that a state house speaker, who received an undisclosed commission from an architectural firm for recommending its services to other officials over whom the speaker held no formal authority, had not committed mail fraud.  583 F.2d 1014, 1027-28 (8th Cir. 1978).

Rabbitt has been called into question both in this circuit, Urciuoli, 513 F.3d at 296 (setting aside the issue of "whether or not Rabbitt is correct"), as well as by other circuits, United States v. Holzer, 816 F.2d 304, 309 (7th Cir. 1987) ("We very much doubt the soundness of this reasoning.  The fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight independent of their intrinsic merit."). To the extent that Rabbitt remains viable, it is not controlling here, and more pointedly, I find it unpersuasive.  The Indictment alleges that Acevedo Vila impermissibly used the weight of his office to lean on his subordinates so as to achieve a suitable outcome for Collaborator 18's business interests.  This kind of official, discretionary action, when subject to an undisclosed conflict of interest, denies the people of Puerto Rico the honest services of their chief executive.

### 4. Use of Interstate Wires

Finally, defendants argue that Counts 1-4 must be dismissed because they fail to satisfy the interstate commerce requirement of 18 U.S.C. § 1343.  Defendants argue that because "each of the communications . . . took place wholly within Puerto Rico," they did not travel across interstate lines, as the law requires that

they do.  (Defs.' Mot. to Dismiss, Doc. No. 19, at 15.)

The Indictment identifies the electronic communications at issue and alleges that the communications were transmitted in interstate commerce.  Moreover, the government contends that the servers relevant to each of those messages were in either Virginia or California.  If these allegations prove to be true, the charged communications meet the interstate commerce requirement because they traveled from Puerto Rico to either California or Virginia, and then back to Puerto Rico.  United States v. Kammersell, 196 F.3d 1137, 1139 (10th Cir. 1999) (finding that instant message between two parties within the same state satisfied interstate commerce requirement of analogous statute because the message traveled to internet provider's server in a different state).  Thus, at this stage of the proceedings, the interstate communication requirement is satisfied.

**B.    CONSPIRACY TO COMMIT MONEY LAUNDERING**

Defendants argue that Count 5 should be dismissed because it fails to allege an essential element of a money laundering conspiracy statute; namely, that the activity that dirtied the money was distinct from the activity that laundered it.  (Defs.' Mot. to Dismiss, Doc. No. 19, at 17.)  I disagree with the

defendants' assessment of the charging document.

The Indictment tracks the language of 18 U.S.C. § 1956(a)(1)(B)(i) and alleges that the money laundering scheme "involved the proceeds of specified unlawful activity . . . as more specifically described in Counts One through Four." (Indictment, Doc. No. 1, at 7.)  The government charges that defendants conducted "financial transactions with corporate checks issued by Collaborator 18 to Company E, in order to disguise and conceal the receipt of illegal payments made for the benefit of Comité Anibal, and *credited to the campaign's unreported debt with Company E and other vendors*."  (Id. at 7-8) (emphasis added).  The Indictment also states that once the money was transferred to Company E, it cancelled the Governor's campaign debts or "*used parts of those payments to pay other campaign vendors for services provided . . .*" to the Governor's campaign. (Id.) (emphasis added).  Thus, it charges that the activity that dirtied the money is distinct from the laundering activity.  Although the government clearly could have done a better job of drafting the Indictment, it is nonetheless sufficient to withstand a motion to dismiss.[3]

---

[3]  Defendants also argue that because of inconsistencies in the government's own factual assertions, Company E could not have

### IV.  CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss the Indictment (Doc. No. 19) is denied.

SO ORDERED.

<pre>
                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge
                              District of New Hampshire
                              Sitting by Designation
</pre>

January 9, 2009

cc: Counsel of Record

---

paid vendors using *entirely* "dirty" money.  Although it is clear that at least a portion of the "dirty" money could have been used, these discrepancies will be resolved at trial.  See United States v. Jamieson, 427 F.3d 394, 404 (6th Cir. 2005) ("[N]ot all of the money involved in the transactions must be derived from the unlawful activity.").